[Cite as *Adae v. Univ. of Cincinnati*, 2011-Ohio-3146.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us


CYNTHIA A. ADAE, et al.

      Plaintiffs

      v.

UNIVERSITY OF CINCINNATI, et al.

      Defendants
      Case No. 2007-08228

Judge Alan C. Travis

<u>DECISION</u>


{¶ 1} Plaintiff, Cynthia Adae,[1] brought this action against defendants, the University of Cincinnati (UC) and Clinton Memorial Hospital Regional Health System (CMH),[2] alleging a claim of medical malpractice. Plaintiff's spouse, Howard Adae, asserted a claim for loss of consortium. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} In late June or early July 2006, plaintiff developed a spinal epidural abscess, a rare, infectious disease process which, if left untreated, results in neurological deficits, progressive paraplegia and death. Plaintiff alleges that a UC physician, Jennifer Bain, M.D., was negligent in failing to diagnose the disease. As a result of the delay in diagnosis, plaintiff was rendered an incomplete paraplegic and has suffered loss of both her bowel and bladder functions. Mr. Adae testified that he assists

---

[1] References to "plaintiff" in this decision are to Cynthia Adae.

plaintiff with her medical needs and disabilities on a day-to-day basis.  Based upon the testimony and other evidence presented, the chronology of events that gave rise to plaintiff's claim is as follows.

**{¶ 3}**  On Tuesday, June 27, 2006, after working into the early evening hours at her family-owned fruit farm, plaintiff began to experience symptoms which she attributed to possible heat stroke.  Later that day, plaintiff used a home thermometer to take her temperature; she obtained a reading of 104 degrees.

**{¶ 4}**  On Wednesday, June 28, 2006, plaintiff began to experience intense pain in her back and chest.  The pain intensified and she felt more ill as the day progressed. That evening, plaintiff went to the CMH After Hours Care Clinic where she was seen by Anne Phelan Adams, M.D.  According to Dr. Adams' Care Record (Joint Exhibit 1, Volume 1, Tab 4), plaintiff's chief complaint was chest pain, sometimes radiating into her left shoulder and arm, which she reported to have experienced intermittently for two days.  Plaintiff's blood pressure was recorded as 200/100 with a heart rate of 128.  Dr. Adams concluded that plaintiff was at high risk for Acute Coronary Syndrome (ACS) and transferred her to the hospital's emergency room for further evaluation.

**{¶ 5}**  Plaintiff arrived at the CMH emergency room at 10:15 p.m., where she was seen by David C. Lee, M.D.  According to Dr. Lee's Emergency Services Record (Joint Exhibit 1, Volume 1, Tab 5), plaintiff stated that her chest pain had occurred intermittently for a period of two or three weeks, that her pain sometimes started in her back and sometimes started in her chest area, that the pain at times increased with deep breathing, and that the pain at times radiated down her left arm.  Plaintiff further stated that she had a fever, "felt hot," and that her maximum temperature had been 103 to 104 degrees.  Dr. Lee noted that plaintiff's temperature at the time was 99.3 degrees,

---

[2]UC  operates a Family Medicine Residency Program at the privately-owned CMH facilities located in Wilmington, Ohio.  UC faculty serve as attending physicians for the residency program. References to "defendant" in this decision are to UC.

that she had a heart rate of 140, and that both her blood pressure and blood sugar levels were elevated. She was given aspirin and various other medications, and a series of diagnostic tests were performed. Dr. Lee also ordered blood cultures. He had plaintiff admitted to the hospital for further observation and testing to rule out myocardial infarction and ACS. Dr. Lee also listed an "infectious etiology" in his differential diagnoses which included pneumonia and endocarditis.

{¶ 6} On Thursday, June 29, 2006, at 3:00 a.m., plaintiff arrived at her CMH patient floor and was seen by Maisha Pesante, M.D.,[3] a first-year resident in the UC Family Medicine Program. According to Dr. Pesante's history and physical examination, plaintiff's chief complaint was severe chest and back pain. (Plaintiffs' Exhibit 1A.) Plaintiff told Dr. Pesante that she had been in pain for approximately two days, that her pain level was an eight on a scale of ten, that the pain was located primarily in the area below her left shoulder blade, and that it radiated to her chest. Plaintiff also stated that the chest pain was sharp, waxing and waning, and that it was worse with certain positions such as leaning to the left or lying down. She further related that she had a fever of 104 degrees for two days, that decongestant improved her symptoms, that she felt better when sitting up, and that she could not lie down. Dr. Pesante noted that plaintiff's pain limited her ability to move her arms, and that plaintiff experienced pain when moving her chin to her chest. Plaintiff's blood pressure at the time was 208/86, she had a heart rate of 145, and her temperature was 99.2.

{¶ 7} In her differential diagnoses and treatment plan, Dr. Pesante first listed ruling out ACS, including "angina versus thyroid abnormality versus GI versus musculoskeletal versus viral meningitis." (Plaintiffs' Exhibit 1A.) The remainder of the plan was directed to plaintiff's diabetes and hypertension issues. Although it was not stated in the history and exam notes, Dr. Pesante testified in her deposition that she

---

[3]Dr. Pesante was an employee of CMH.

was aware that blood cultures had been ordered in the emergency department and that the results were pending. (Defendants' Exhibit D.)

{¶ 8} Later in the morning of June 29, Dr. Bain came on duty as attending physician. Dr. Bain testified that the normal protocol for CMH staff was to meet with the residents who had been on duty, discuss their cases, review the patients' emergency room and After Hours Care records, if any, and then begin making rounds. During rounds, Dr. Bain performed her own history and physical exam of patients. In her Progress Note (Plaintiffs' Exhibit 1E), Dr. Bain noted that plaintiff had reported a two-day history of chest and back pain rated a level eight on a scale of ten, that the pain was "substernal and actually pain below the shoulder blades [and] radiated anteriorly to the substernal area." She further noted that the pain was reported to be worse when lying down, that plaintiff felt better sitting up straight, and that aspirin had helped to relieve her pain. Dr. Bain noted that plaintiff had a fever for two days prior to admission that had reached 104 degrees at its highest. Upon examination, she found that plaintiff's systolic blood pressure was down from 208 to the 160s, and that her pulse had dropped from 145 to 100. She reported that plaintiff was "afebrile" (without fever) and that "[s]he has been afebrile." She also reported that plaintiff was "lying in bed although propped up comfortably," but noted that plaintiff flinched with some movements. Plaintiff told her that her pain was somewhat better. Dr. Bain recorded that plaintiff's lungs were clear but that she was not taking any deep breaths because of the pain she was experiencing. She found that plaintiff had some pain with complete flexion of her neck, although she otherwise had a good range of motion.

{¶ 9} In evaluating plaintiff's presenting symptoms, Dr. Bain recorded that ACS had been ruled out, that plaintiff's blood tests were normal, with the exception of her elevated blood sugar level, and that her cardiac enzymes were normal, as was her EKG. Dr. Bain further recorded that the treatment team suspected that plaintiff's chest pain was musculoskeletal, but that a CT scan of her chest would be ordered to rule out

the possibility of an aneurysm. (The results of the scan revealed no abnormalities.) Dr. Bain ordered additional lab work and a CT scan of plaintiff's abdomen to evaluate her liver and gall bladder, and additional thyroid testing to be performed on an outpatient basis. No further action was taken with regard to the infectious process that was at issue. Plaintiff's blood cultures were negative at the time. Plaintiff was discharged at approximately 5:00 that afternoon with instructions to follow up within the next week with Leah Avera, M.D., her primary care physician.

{¶ 10} On Saturday, July 1, 2006, Mr. Adae telephoned Dr. Avera. He told her about plaintiff's hospitalization, and related that she continued to experience back pain. According to Dr. Avera, he also commented to the effect that plaintiff "may have had a temperature." Dr. Avera recommended that he take plaintiff to the Middletown Regional Hospital emergency room (MRH) for further evaluation. (Deposition, Page 14, Lines 8-13.)

{¶ 11} That afternoon, plaintiff went to MRH and was seen by Tao Nguyen, M.D. According to Dr. Nguyen's Medical Record (Joint Exhibit 1, Volume 1, Tab 6), plaintiff's chief complaint at that time was right shoulder and back pain, which had been "ongoing for five days." She also reported that she could not lie down because it was too painful to do so. In addition to various other tests, Dr. Nguyen ordered a CT scan of plaintiff's chest, which produced a negative result for pulmonary embolism. Further, although it was not ordered by Dr. Nguyen, a CT scan was taken of plaintiff's head; that test revealed a sinus infection. Dr. Nguyen called CMH in an attempt to get copies of plaintiff's medical records, but learned that the records department was closed until Monday. He called Dr. Avera and discussed the case with her. Plaintiff was discharged with prescriptions for antibiotics to treat the sinus infection and Percocet for pain; she was instructed to see Dr. Avera on Monday, July 3.

{¶ 12} Also on Saturday, July 1, a call was made from the CMH laboratory to Geetha Ambalavanan, M.D., the resident on duty that day. The lab reported that

plaintiff's blood cultures were showing "gram positive cocci in clusters." The next day, July 2, the lab called Dr. Pesante to report that the cultures were positive for staphylococcus aureus.[4] Neither Dr. Ambalavanan nor Dr. Pesante contacted either Dr. Bain or Dr. Gick, who was the UC attending physician on call for that weekend. It is unclear whether either resident, or any other CMH staff, attempted to contact plaintiff or Dr. Avera. According to Dr. Avera, if she had learned of the positive results, she would have immediately had plaintiff admitted to the hospital. She stated that she would have "empirically[5] started her on antibiotics and then attempted to find the source of the infection." (Deposition, Page 26, Lines 16-19.)

**{¶ 13}** On Monday, July 3, 2006, plaintiff called Dr. Avera's office to schedule an appointment. She testified that she was told that Dr. Avera did not have any openings in her schedule that day, so she made an appointment for Wednesday, July 5. She spent the day at home.

**{¶ 14}** Tuesday, July 4, 2006, plaintiff again spent the day at home. That evening, she began to a experience flu-like symptoms, numbness and weakness in her extremities, she fell at least once, dropped things several times, and had some slurred speech.

**{¶ 15}** On Wednesday, July 5, 2006, plaintiff went to Dr. Avera's office as scheduled. At that point, she could barely walk. Plaintiff testified that Mr. Adae carried her to the car and then into the office when they arrived. Upon examination, Dr. Avera noted that plaintiff's blood sugar was extremely elevated. She also noted that plaintiff had been "somewhat non-compliant" with her check-ups, that her "labs were not checked regularly" and that she "self-adjust[ed] her insulin doses." (Defendants' Exhibit

---

[4]Staphylococcus aureus was described as a type of bacterial infection.

[5]Empiric therapy was described as that which is initiated prior to determination of a firm diagnosis. For example, such therapy could involve use of broad-spectrum antibiotics before identifying the specific organism that is causing an infection.

F-1.)    Dr. Avera felt that plaintiff   was suffering from diabetic ketoacidosis, and immediately sent her to MRH for admission.  (Deposition, Pages 38-41, Lines 20-13.)

**{¶ 16}** At MRH, plaintiff's symptoms progressed to paralysis of her lower extremities, and the spinal epidural abscess was ultimately diagnosed.  She underwent neurosurgery on July 6, 2006, and remained hospitalized until July 18, 2006; she has been disabled since that time.  Plaintiff contends that Dr. Bain was negligent in failing to order appropriate testing to determine the cause of her back and neck pain, in ignoring her self-reported 104 degree temperature, and in discharging her from the hospital before obtaining the results of the blood cultures that would have positively identified an infectious process.  Plaintiff contends that Dr. Bain's negligence is the sole proximate cause of her injury.

**{¶ 17}** In order to prevail on a claim of medical malpractice or professional negligence, plaintiffs must first prove:  1) the standard of care recognized by the medical community; 2) the failure of defendant to meet the requisite standard of care; and 3) a direct causal connection between the medically negligent act and the injury sustained. *Wheeler v. Wise* (1999), 133 Ohio App.3d 564; *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127.  The appropriate standard of care must be proven by expert testimony.  *Bruni,* at 130.  That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances.  Id.

**{¶ 18}** Plaintiffs presented the testimony of three experts. The first to testify, by way of videotaped deposition, was Finley W. Brown, Jr., M.D., a board-certified family physician.  Dr. Brown opined that Dr. Bain did not meet the standard of care in her treatment of plaintiff's complaints of fever and back pain.[6]   He testified quite emphatically and repeatedly that "fever and back pain is spinal epidural abscess until proven otherwise and has to be worked up and ruled out" because of the potential for

catastrophic consequences. He criticized Dr. Bain's treatment because she did not do any specific workup as to the cause of plaintiff's back pain, and never tried to determine why plaintiff could not lie flat. Although plaintiff's complaints had varied as to the location of her pain, Dr. Brown noted that the back pain was substantiated in both the medical records and the nursing notes. He pointed out that in the nursing notes for 4:00 a.m. and 4:15 a.m. on June 29, it was stated that plaintiff complained of upper mid-back pain, and that from 7:05 a.m. to 3:40 p.m. there were five separate notations of complaints of "mid upper-back pain."

{¶ 19} With regard to plaintiff's self-reported fever, Dr. Brown testified that it was a "serious issue" because the fever had been present for a number of days and it was up to 104 degrees in the days before she presented to the emergency room. He stated that the fever "indicated more likely than not infectious disease and required [a] detailed workup and evaluation to find the source of the infection, diagnose it, and treat it." (Deposition, Page 14, Lines 19-24 and Page 15, Lines 1-2.) Dr. Brown explained that "[a]n infectious process usually involves, if it's significant, the body responding to the infection by increasing the number of white cells that are involved in fighting the infection [and] gobbling up the bacteria" to get rid of it. (Deposition, Page 22, Lines 3-8.) He noted that plaintiff had an elevated white blood cell count at CMH which, he explained, "certainly strongly suggests * * * an infectious disease." (Deposition, Page 22, Lines 9-11.) He also noted that plaintiff's blood count showed other abnormalities which were consistent with an acute, aggressive response to an infectious process. Further, Dr. Brown noted that plaintiff's blood sugar was elevated, an indication that she was under poor diabetic control. Dr. Brown explained that diabetics are known to have an impaired immune response and do not fight infection as well as non-diabetics. He also noted that, six hours before her discharge from the hospital, plaintiff's pulse rate,

---

[6]It is undisputed that Dr. Bain's treatment and care of plaintiff's cardiac and diabetic symptoms complied with

respirations, and blood pressure were elevated, all of which were consistent with a patient having an infectious process. He testified that "the answer to all these issues, the cause of her back pain, the cause of her fever, where her infection was * * * the high blood sugars, none of those were resolved and [plaintiff] was still uncomfortable * * * still ill." (Deposition, Page 27, Lines 2-9.)

{¶ 20} Based upon the foregoing, Dr. Brown further opined that "plaintiff should never have been discharged from [CMH] until the [blood] cultures came back especially considering how ill she was at discharge." (Deposition, Page 14, Lines 6-10.) He stated that "if the physicians taking care of her kept her in the hospital and practiced in a reasonable way, practiced a reasonable level of medicine, what they would have done is recognized that this back pain was not diagnosed and called in a neurologist and an orthopedist who would have ordered imaging studies and the diagnosis of epidural abscess would have been made." (Deposition, Page 29, Lines 3-10.) It was his opinion that if plaintiff had been in the hospital on July 1, when the gram stain positive culture came back, the lab would have called her floor, the proper physician(s) would have been notified, and plaintiff would have had "the best chance to avoid the [permanent] neurologic injuries that she has." (Deposition, Page 30, Lines 12-14.) It was further Dr. Brown's opinion that Dr. Bain was at least 90 percent responsible for plaintiff's outcome.

{¶ 21} The court notes that Dr. Brown acknowledged that spinal epidural abscess is an uncommon condition, and that he could not recall having diagnosed it in any of his patients during his 40 years in practice. However, he insisted quite credibly that "100 percent of patients of mine who present with fever and back pain have epidural abscess until proven otherwise, so I've done the workup, I've thought they might have that, and I've made the effort to rule it out." (Deposition, Page 10, Line 24 and Page 11, Lines 1-4.)

---

the applicable standard of care.

{¶ 22} Plaintiffs next presented the videotaped testimony of C. Keith Beck, M.D., who is board-certified in both internal medicine and infectious disease. Dr. Beck also opined that Dr. Bain failed to meet the standard of care in her treatment of plaintiff's fever and back pain. Dr. Beck noted that plaintiff was "a middle-aged woman with a long history of diabetes. She presented with an obvious infectious syndrome. When a middle-aged person with diabetes has an infection with the constellation she presented, it is highly likely that she has a bacterial infection requiring specific therapy." (Deposition, Page 15, Lines 4-9.) Dr. Beck testified that, as such, it was "mandatory" for Dr. Bain "to recognize the high potential for morbidity" and to do two things: 1) provide empiric therapy to treat the bacterial infection and; 2) make a diagnosis of what was causing the infection. Dr. Beck opined that Dr. Bain failed in both of those respects.

{¶ 23} In explaining what he meant by "an obvious infectious syndrome," Dr. Beck testified that plaintiff "had what we call a systemic inflammatory response syndrome. She gave a history of fever prior to admission. She had tachycardia and an elevated respiratory rate, which are components of inflammatory response. She also had an elevated white blood count * * *. And she had localizing symptoms pointing to the back and neck which were of a severe nature." (Deposition, Page 16, Lines 8-9 and 0-4.) He further explained that, "all of these things combined, as well as some ancillary laboratory tests which were the result of an inflammatory process, made it highly likely that she had a bacterial infection at the time of presentment and at the time of discharge from CMH." (Deposition, Page 16, Line 5 and Page 17, Lines 1-4.) Dr. Beck testified that plaintiff's back and neck pain were also significant evidence of an infectious syndrome. Dr. Beck was critical of Dr. Bain because she did not take any steps to determine the source of plaintiff's infection.

{¶ 24} According to Dr. Beck, the appropriate diagnostic steps under the circumstances would have included an MRI of plaintiff's neck and spine and that, if such a workup had been done, plaintiff would have been in the hospital when her blood

cultures came back positive. (Deposition, Page 18, Lines 1-9 and 0-4.) Dr. Beck testified that a 104 degree temperature just before presentment to the hospital was very significant for an adult and "overwhelmingly" indicated a high likelihood of bacterial infection. (Deposition, Page 19, Lines 1-2.) Dr. Beck stated that a fever of that nature was "crying out for both empiric therapy to protect [from] further damage and * * * mandat[ed] a diagnostic effort to reveal the cause of the fever so that specific therapy and resolution of the process" could be assured. (Deposition, Page 20, Lines 7-9 and 0-2.) It was Dr. Beck's opinion that if treatment had been appropriately rendered, plaintiff's spinal abscess would have been discovered before it caused permanent neurological damage.

**{¶ 25}** Finally, Dr. Beck opined that Dr. Bain was "overwhelmingly" responsible for plaintiff's outcome. He explained that "[i]n the teaching hospital situation, the attending physician of record is medically, legally and morally responsible for the conduct of the residents and * * * [b]y looking at the medical records and the depositions in this case, Dr. Bane [sic] had adequate information and access to adequate information such that she should have guided the course to meet the standard of care. That is the paramount role of the attending physician. And in this case, she did not meet that standard of care. Had her actions as the physician of record for this patient met the standard of care, the patient would have remained in the hospital on appropriate antibiotics, and the issue of a call back for blood cultures would be really a moot point because it never would have happened." (Deposition, Page 32, Lines 6-9 and Page 33, Lines 2-9, 0-7.)

**{¶ 26}** With respect to any physicians who treated plaintiff after her release from CMH, Dr. Beck reiterated that "their interactions would not have happened had Dr. Bane [sic] met the standard of care. So virtually all of the responsibility, in terms of preventing the bad outcome, had the standard of care been met at [CMH], all the rest is a moot point." (Deposition, Page 34, Lines 3-8.)

{¶ 27} Plaintiffs' third expert was Carole Ann Miller, M.D., a board-certified neurosurgeon. Although Dr. Miller offered her opinion regarding the standard of care of a reasonable clinician, she did not offer opinions with respect to the standard for family practitioners. According to Dr. Miller, a reasonable clinician faced with a patient exhibiting plaintiff's constellation of symptoms would have, after first ruling out the acute cardiac issues, proceeded to work up the infectious syndrome and determine its cause. She noted that, although plaintiff's fever at CMH decreased from the self-reported 104 degrees, she had also been taking aspirin and was given aspirin in the emergency department that would have masked the fever. She also noted that plaintiff's white blood cell count increased while she was at CMH, a factor that would also signify infection. Dr. Miller testified that plaintiff's expression of her pain, radiating from her shoulder to her chest, is a typical description of epidural abscess; she did not believe that it was consistent with pain experienced from the type of farm work that plaintiff had been doing. Moreover, Dr. Miller pointed out that the nurses' notes described exactly where plaintiff's back pain was and, indeed, that location was where the abscess was ultimately found. She testified that she had not found any description in the CMH records that Dr. Bain performed a physical examination focused on the cause of plaintiff's back pain. She opined that, if an MRI had been performed on plaintiff's spine at CMH, it would have shown an abnormality that would have led to the diagnosis of spinal epidural abscess. According to Dr. Miller, if a proper workup had been performed and empiric antibiotic therapy commenced, the infection could have been eliminated before it had caused irreparable neurological harm.

{¶ 28} In response to plaintiffs' evidence, defendants presented the testimony of Dr. Bain, the deposition testimony of Drs. Pesante, Ambalavanan, Gick, Nguyen, and Avera, and the videotaped deposition of their expert, Terrance L. Baker, M.D.

{¶ 29} Dr. Baker was board-certified in family practice, geriatrics, and emergency medicine. He opined that Dr. Bain complied with all applicable standards of care. He

stated that her history and physical examination of plaintiff complied with the standard of care, as did her discharge diagnoses. (Deposition, Page 22, Lines 2-4.) Dr. Baker related that, in his experience and medical practice, he sees one or two cases of spinal epidural abscess per year. He testified that because of its rarity, epidural abscess "is not a condition that many family doctors actually see in the course of their practice." (Deposition, Page 14, Lines 14-15.) Dr. Baker further related that it is "not unusual for multiple practitioners, multiple health care providers to actually see the patient, examine the patient, [and] believe that the patient's signs and symptoms are musculoskeletal in nature, which is exactly what occurred in * * * the case of [plaintiff]." (Deposition, Page 14, Lines 17-21.) It was his opinion that the diagnosis is typically not made until the patient "develops focal sensory or motor symptoms of some sort which then suggest to the practitioner that [there is] something going on either in the brain or in the spinal cord and that [requires] advanced testing." (Deposition, Page 15, Lines 4-7.) He further testified that he did not believe that there were any "classic" symptoms of spinal epidural abscess.

{¶ 30} Dr. Baker testified that plaintiff's complaints that she could not lie flat were not significant, and that "in and of itself" such complaints were not an indication that further investigation was required. (Deposition, Page 29, Lines 5-7.) He stated that "[i]n patients such as [plaintiff] who work on a farm and who are regularly involved in * * * performing farm activities * * * it would not be unusual to have musculoskeletal pain of this type and we see it all the time and * * * it is not * * * itself reflective of anything more serious than what it is." (Deposition, Page 28, Lines 18-21 and Page 29, Lines 1-3.) Dr. Baker was further of the opinion that neither plaintiff's elevated heart rate nor blood sugar level, nor her self-reported temperature of 104 degrees, were symptoms that should have led to a diagnosis of spinal epidural abscess while she was hospitalized at CMH. Similarly, he did not believe that plaintiff's elevated white blood cell count

signified an infectious process, but rather, that it "simply implies that there is a stress being applied to the body." (Deposition, Page 40, Lines 8-12.)

{¶ 31} Finally, Dr. Baker testified that the standard of care did not require that plaintiff remain at CMH until her blood culture results were known; that an MRI be performed on her neck and back; or that empiric antibiotics be initiated. With respect to those issues, he opined that blood cultures can take four to five days to process and that it would not be economically feasible to remain hospitalized for that purpose. He explained that, in 2006, an MRI was a highly advanced testing device that was utilized only for specific medical symptoms which were not present in plaintiff's case. He described the use of empiric antibiotics as akin to "shotgunning, sort of shooting from the hip * * * just hoping you hit something." (Deposition, Page 62, Lines 6-9.)

{¶ 32} Upon review of all the evidence presented, the court finds that Dr. Bain failed to meet the standard of care in her treatment of plaintiff's fever and back pain. The court further finds that Dr. Bain's negligence is the sole proximate cause of plaintiff's outcome. The court is persuaded by plaintiffs' experts that Dr. Bain could have discovered the spinal epidural abscess had she taken appropriate steps to do so. Of particularly persuasive value was Dr. Brown's emphatic testimony that fever and back pain constitute spinal epidural abscess until proven otherwise, and that a diagnosis was mandated. Equally persuasive was Dr. Beck's testimony regarding plaintiff's obvious infectious syndrome, and the appropriate diagnostic steps under the circumstances. It is evident to the court that Dr. Bain did not do an appropriate workup of plaintiff's fever and back pain.

{¶ 33} In both her June 29 Progress Note and during her trial testimony, Dr. Bain acknowledged that she was aware that plaintiff had reported a fever for two days prior to admission that had reached 104 degrees. Although she recorded that plaintiff was afebrile at the time, she acknowledged that plaintiff had been taking aspirin. She acknowledged that plaintiff's white blood cell count was elevated but attributed it to the

stress of the procedures she had undergone during her hospitalization; she did not include it as a consideration in her Progress Note. Dr. Bain also knew that plaintiff was diabetic, that her blood sugar was not under control, and that uncontrolled blood sugar compromises the immune system. Dr. Bain further acknowledged that she would have known that blood cultures had been ordered, and that the results were pending. Nevertheless, Dr. Bain made no reference to the pending blood cultures prior to approving plaintiff's discharge on June 29.

{¶ 34} In addition, Dr. Bain acknowledged that fever and back pain are symptoms of spinal epidural abscess. She was aware that plaintiff had a two-day history of severe back and chest pain that worsened if she was lying down, that she flinched with certain movements, that she had pain with flexion of her neck, and that she was not taking deep breaths because of her pain. Dr. Bain acknowledged that an MRI would have provided a definitive diagnosis. She attributed the complaints of back and neck pain, in large part, to musculoskeletal stress based upon plaintiff's history of farm work. Dr. Bain's discharge diagnosis was musculoskeletal pain of unknown etiology. In the court's view, her lack of concern for the issues of fever and back pain is further evidenced by her instruction to plaintiff that she need only to follow up on those issues with Dr. Avera within the next seven days.

{¶ 35} Although Dr. Baker supported Dr. Bain's care and treatment of plaintiff, the court finds that his testimony was outweighed by the testimony of plaintiffs' experts. Specifically, Dr. Baker's opinions that there are no classic symptoms of spinal epidural abscess, and that the majority of patients are not diagnosed with it until after they exhibit neurological damage, were not persuasive and were directly contradicted by Drs. Brown, Beck, and Miller. Dr. Baker acknowledged that an infectious process was included in Dr. Bain's differential diagnosis, and that plaintiff's uncontrolled diabetes impacted her immune system and ability to combat infection. He also acknowledged that there was no workup of plaintiff's back pain or any response to her abnormal white

blood cell count.  When asked to assume that the nurses' notes were true, and that plaintiff consistently complained of upper mid-back pain, Dr. Baker acknowledged that a reasonably prudent clinician should have made a determination as to where the pain was specifically located and why plaintiff could not lie flat.  Finally, Dr. Baker acknowledged that if plaintiff's spinal epidural abscess had been recognized and treated before she started experiencing sensory and neurological deficits, it was more probable than not that she would have survived the disease without any permanent damage.

{¶ 36} The court acknowledges that the opinions differ on whether Dr. Bain's care of plaintiff fell below the standard of care in the medical community.  However, this is not a case of employing simple hindsight to prove plaintiffs' case, as argued by defendants.  The testimony and opinions of plaintiffs' experts was unequivocal that, because of the potential for catastrophic injury or death when presented with symptoms such as plaintiff's, the standard of care mandates that a physician rule out infectious process and epidural abscess.  Failure to do so is a deviation from the standard of care. The court is persuaded that Dr. Bain failed to address all parts of the differential diagnosis which was clearly a part of the care and treatment required for her patient. That failure was a deviation from the standard of care and directly and proximately resulted in injury to plaintiff.

{¶ 37} Accordingly, the court finds that plaintiffs proved their claim by a preponderance of the evidence.

{¶ 38} At the close of the proceedings, plaintiffs moved the court for a directed verdict, pursuant Civ.R. 50(A), as to the apportionment of liability to non-parties under R.C. 2307.22.  For the reasons set forth above, the motion is DENIED as moot.

{¶ 39} In summary, plaintiffs have proven that they are entitled to relief and judgment shall be entered in their favor.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us


CYNTHIA A. ADAE, et al.

Plaintiffs

v.

UNIVERSITY OF CINCINNATI, et al.

Defendants
Case No. 2007-08228

Judge Alan C. Travis

JUDGMENT ENTRY


This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiffs. The case will be set for trial on the issue of damages.


_____
ALAN C. TRAVIS
Judge

cc:

Anne B. Strait
Naomi H. Maletz
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Michael R. Thomas
4 Sycamore Creek Drive
Springboro, Ohio 45066

Kenneth S. Blumenthal
Michael J. Rourke
495 South High Street, Suite 450
Columbus, Ohio 43215

LH/cmd
Filed June 1, 2011
To S.C. reporter June 22, 2011